## MORGAN *v.* PLOTKIN.

1. MECHANICS' LIENS—TIME—EVIDENCE—SUFFICIENCY.

   In a suit to enforce a mechanic's lien, oral evidence in support of a verified claim filed December 19th, showing that the last work done was on October 31st, there being no evidence to the contrary, *held*, sufficient to support the trial court's finding that the lien was filed within the statutory period.

2. SAME—COMPLIANCE WITH CONTRACT—WAIVER—ACQUIESCENCE—RATIFICATION.

   Where neither the architect nor defendant made any objection to the manner in which plaintiff was covering the underground pipes, which he claimed was superior to the method provided for in the contract, although their attention was called to it while the work was being done, it was too late to complain thereof at the time of the trial, and the trial court properly held that defendant,

by his silence and apparent acquiescence with full knowledge of how the work was being done, in effect ratified and accepted the job.

Appeal from Wayne; Webster (Arthur), J. Submitted January 5, 1922. (Docket No. 28.) Decided July 20, 1922.

Bill by Clarence S. Morgan against Samuel Plotkin and others to foreclose a mechanic's lien. From a decree for plaintiff, defendant Plotkin appeals. Affirmed.

*S. Homer Ferguson* (*Frank B. Ferguson*, of counsel), for plaintiff.

*William Henry Gallagher*, for appellant.

STEERE, J. On March 25, 1916, plaintiff, who was engaged in the business of manufacturing and installing piping and boiler covering, entered into a contract with defendant Plotkin to furnish material and perform required work of that kind in a building which the latter was constructing, under a contract by which he agreed for a consideration of $1,325 to—

"provide all the materials and perform all the work for the pipe covering for the following:
"All steam risers in outside walls.
"All return risers in outside walls.
"All hot and cold water piping throughout.
"All steam piping in attic and basement.
"All underground returns to be encased, in crock."

The work was to be commenced at once, "pushed" as fast as conditions permitted "to avoid all delay;" 85% of the value of completed work was to be paid for as performance was in progress, on estimates by the architect, and final payment of 15% within 30 days after entire completion and acceptance of the job by the architect. The work was to be done, "in ac-

cordance with general conditions," as shown in the contract and drawings prepared by the architect made a part thereof. Plaintiff commenced performance promptly and on April 17, 1916, received an architect's certificate for $800 upon which he was only able to obtain from defendant $600. He claims to have completed his contract when and so far as conditions in the erection of the building would permit, his last day's work being done on October 31, 1916. Unable to otherwise collect further payment therefor he filed a claim of mechanic's lien on December 19, 1916, and served a statement on defendant Plotkin on December 23, 1916, showing first work and material furnished March 30, 1916, and the last work done on October 31, 1916. No question is raised against the regularity of the steps taken to establish his lien, except the time in which it was filed. This bill was filed to enforce said lien. Defendant Plotkin answered with denial and counter-claim for damages resulting from plaintiff's failure to carry out the contract according to its terms. The case was heard on pleadings and proofs taken in open court resulting in a decree in favor of plaintiff for the sum of $715, with interest amounting to $78.50. Defendant appealed.

The questions raised in the court below and here as interrogatively stated in the brief of defendant's counsel are:

"(1) Is there any competent evidence of the last date on which work was done, and hence of the validity of the lien? (Raised by motion to dismiss.)

"(2) Is there evidence of such performance of Morgan's contract as to entitle him to a decree?

"(3) Was Morgan's breach of his contract waived by Plotkin?"

Upon the contention there was no competent evidence of when the last work was done defendant's counsel urge that plaintiff's testimony is in its nature

hearsay, in support of which the following excerpts are quoted:

"The last work was done October 31st; I would not say positively whether I was on the job that day."

Cross-examination:

"My records show the last work was done on October 31st.

"Q. What records are they?

"A. Ordinary business records for delivery tickets and the time tickets, records made by my employees, but not by myself, although the final records were made by me. The record as showing October 31st was made by me personally, but was copied from the records of my employees and the pay book, so that when I say October 31st was the last day, I mean that I took from my employees' report the last day they were there."

He also testified upon that subject in part as follows:

"I was frequently on the job as it progressed. The last time on October 31st, at which date I completed the job so far as it could be completed.   *   *   *

"I know of my own knowledge that on the 31st the men worked on that job because my superintendent reports him on the job. Mr. Cassidy is the superintendent, but is not in the city; in the service. I was on the job after that day, but I cannot name any particular time, only I know I was on after the men left because of the fact that this little heater was not in.

"Q. Do you know how many days it was you were on, afterwards?

"A. Probably a week.

"Q. Not later than a week?

"A. It might have been longer, I could not name the time as to that, I can't remember the specific instance."

. In connection with plaintiff's oral evidence was the verified claim of lien filed December 19, 1916, and bill of complaint under oath filed April 28, 1917, showing the last work done October 31, 1916.   No evi-

dence was offered to the contrary. We think the record contained evidential support for the trial court's finding that "the lien was filed within the statutory period."

Plaintiff's evidence showed that he faithfully completed his contract as closely as conditions permitted, with two exceptions, and did some extra work because of repairs and changes for which he made no charge. The first, as he testified, was failure to cover the little heater he went there to see about "possibly a week" or longer after they quit, which was not there when his men had otherwise finished the job and left, the second being that he did not encase the underground returns in *crock* as specified, but instead applied a, thick insulated covering protected by a roofing and asphalt jacket, which he claimed was the customary method in such cases and better than the method specified by the architect in his contract, which simply called for crock with no provision for filling and sealing the joints. He testified this change was made with the approval of the steam fitter and plumber, named Applebaum, who was in charge of the work and gave him instructions, and also with defendant's knowledge, while the work progressed, before the underground returns were covered.

The cost of covering the little heater, shown not to exceed $10, was apparently allowed to defendant in the trial court's decree. The serious contention as indicated by the testimony taken and argument of counsel is plaintiff's failure to encase the underground returns in crock, which defendant claims materially shortened the life of the pipes and diminished the value of his building.

Plaintiff's contention is that the covering or encasing which he adopted was an approved method and a better job for protecting the underground piping than the faulty specification of the architect

whom he was unable to see at the building, or elsewhere, while the work was going on; that he consulted with and had the approval of Applebaum who was apparently in charge and the only representative of defendant except as the latter occasionally came around; that on such an occasion his attention was called by Applebaum to how the work of covering the underground returns was being done and he allowed it to proceed, made no objection to plaintiff then or on later occasions when payment was requested of him, until this suit was begun. Claiming his silence when he should have spoken amounted to approval, it is urged for plaintiff that he is now estopped.

Of this Plotkin testified in part:

"I never talked with Morgan about this part of the contract. * * *

"Q. Did you see the pipe that was not covered?

"A. I saw that. I saw all the way through. I cannot say what part was not covered, but it was particularly the pipe under the ground which should have been covered with crock. * * * When I missed the crock I didn't go to Morgan's office, but I was after the architect; he used to tell me day after day, that probably he would come the next day until it was too late to wait any longer."

Of the architect, whom Morgan testified he was unable to see, Plotkin said:

"He had full authority to superintend it, * * * he really did not quit the job but he was, frankly, too lazy to come to the job often.

"Q. Did you put him off the job?

"A. Well, no, he really quit after being on that job; he was on several occasions and I really could not get him at the time I wanted him."

On the question of estoppel the trial court found and held, with abundant supporting evidence:

"As to the second ground, it appears that the omis-

sion of the crock from the pipe in the basement was called to the attention of the owner during the progress of the work, and by the owner in turn called to the attention of the owner's architect. If the owner was not satisfied with the work as it was being done, this would have been the proper time for the architect to have compelled the contractor to tear out the work and do it properly. There is no evidence that either the architect or owner ever called this to the attention of the contractor, but permitted the work to continue and, in my judgment, it is too late, on the trial of this lien action to now complain of this omission."

While Applebaum, called by defendant as a witness, denied authorizing plaintiff to do the work as it was done, he also testified that during its progress he called the attention of both Plotkin and his architect to the fact crocking was not being used while the underground work was going on; that when he told the architect about the covering he said "he was going to write a letter," and when he called Plotkin's attention to it, "he said he was going to see Jogerst, the architect." The testimony is undisputed that neither communicated with plaintiff on the subject but permitted the work to continue without change.

Experts were called by the respective parties whose testimony was at variance both as to proper construction of the clause "underground returns to be encased in crock," and whether a job done as they construed it compared favorably or unfavorably with that which was done. Applebaum as an expert testified that a first-class job required sealed crock over an asbestos covering, but admitted that of the "quite a few" underground returns he had installed in Detroit during the three or four years he had worked there none of them were crock jobs, giving as his reason that kind of a job was "speculative work," and "A man don't want to pay for it." He also stated that if the tile was placed around the pipe and sealed so as to be air-tight and water-tight "the pipe would last

a lifetime," but if exposed it was "bound to rot away." This expert testimony collectively considered lends color to the view that there are other things in that line of work besides a first-class job, as he describes it, which are "speculative" and yet in the realm of conflicting theories.

The trial court did not attempt to determine, nor can we find from this record, what damage if any defendant suffered because of plaintiff's not using crock to encase the underground returns. When this suit was heard Plotkin had sold the property. He offered no evidence that it would have sold for more with the underground returns encased in crock, or of any actual damage suffered by him from plaintiff's failure to fulfil his contract. Not only was there no definite proof of damages to defendant upon which the court could allow a counter-claim, but further, as the court rightly held, defendant by his then silence and apparent acquiescence with full knowledge of how the work was being done, followed by taking possession of and selling the property, in effect ratified and accepted the job, and cannot at a later time under changed conditions to plaintiff's disadvantage be heard to complain.

The decree will stand affirmed, with costs.

FELLOWS, C. J., and WIEST, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.

The late Justice STONE took no part in this decision.